**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CENTRAL STATES, SOUTHEAST     )
AND SOUTHWEST AREAS PENSION  )
FUND, and HOWARD MCDOUGALL,  )
Trustee,                             )
                                      )
      Plaintiffs Counter-Defendants,   )
                                        )
      v.                              )     CASE NO.:  08-CV-3338
                                        )
BLUE SKY HEAVY HAULING, INC.,  )     District Judge Robert M. Dow, Jr.
                                        )
      Defendant Counter-Plaintiff.     )

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Central States, Southeast and Southwest Areas Pension Fund and Howard McDougall, Trustee, (collectively "the Fund") sued Blue Sky Heavy Hauling, Inc. ("Blue Sky") to recover $34,380.08 in pension contributions.   The Fund claims that Blue Sky breached provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") and various agreements by failing to pay contributions which were revealed to be owed by an audit covering the period from 2002 through November 2007.   In response, Blue Sky filed counterclaims seeking recovery of over $500,000 in contributions it paid to the Fund since 2002.[1]   The counterclaims are premised upon the Trustees decision to terminate Blue Sky's participation in December 2007 after the Fund learned through the audit that Blue Sky was in violation of the Fund's "adverse selection" rule, which prohibits arrangements under which an employer avoids paying contributions to the Fund on newly hired employees.   Initially, Blue Sky did not

---

[1]  On April 9, 2010, the Fund filed a separate lawsuit against Blue Sky seeking to collect unpaid installments of withdrawal liability. *Central States Pension Fund v. Blue Sky Heavy Hauling, Inc.*, Case No. 10 C 2191 (N.D. Ill.)("*Central States II*"). Blue Sky filed a counterclaim in *Central States II* that Blue Sky concedes "substantial[ly] overlaps" with the counterclaim filed in this case.

challenge the Trustee's determination that it violated the Fund's rule.  Instead, Blue Sky maintained that it was continuously in violation of the rule from 2002 or earlier, thereby triggering a "unilateral withdrawal" from the Fund by 2002.  As a result, Blue Sky claimed that the contributions sought by the Fund from 2002 to 2007 or earlier are not due and the contributions paid to the Fund after the rule violation began in 2002 must be returned.

Plaintiffs have moved for summary judgment [102], prompting Defendant Blue Sky to change its theory of the case and advance new arguments, wholly distinct from its counterclaims.  Blue Sky's conduct, best described as "sandbagging" (see *Estate of Blanco v. Prudential Ins. Co. of America*, 606 F.3d 399, 402 (7th Cir. 2010)), cannot save it from summary judgment or preserve its counterclaims for further litigation.  For the following reasons, the Court grants Plaintiffs' motion for summary judgment [102].  Defendant's counterclaims are dismissed.

## I.      Background

The Pension Fund is a multiemployer pension plan under ERISA, administered by its trustee.  The Fund is financed by contributions remitted by multiple participating employers on behalf of all employees whose job classifications are covered by collective bargaining agreements executed between employers and local unions affiliated with the International Brotherhood of Teamsters ("IBT").  Blue Sky, a Michigan corporation, was party to collective bargaining agreements executed with Local Union 247 of the International Brotherhood of Teamsters[2] and was required to submit contributions to the Fund.  Blue Sky and Local 247 also entered into a Participation Agreement.

---

[2]  Local Union 247 is one of the many local unions affiliated with the IBT that has entered into collective bargaining agreements with employers that require the employer to remit contributions to the Fund.

## A.     The Agreements

Blue Sky began its participation in the Fund under a collective bargaining agreement with Local 247 covering October 23, 1997 through October 26, 2000 (the "1997 CBA"). Blue Sky and Local 247 executed a successor labor agreement that also required contributions to the Fund that covered the period of June 1, 2001 to May 31, 2006, and indicated that it would continue from year to year absent written notice of termination (the "2001 CBA"). The pension clause of the 2001 CBA states:

> [E]ffective June 1, 2001, the Employer agrees to pay into the Central States, Southeast and Southwest Areas Pension Fund for each employee covered by the Agreement * * * $25.60 per day for each regular employee covered by this Agreement who has been on the payroll thirty (30) days or more. The rate per day shall be $28.00 per day effective June 1, 2002; $30.80 per day effective June 2, 2003; $32.40 per day effective June 1, 2004 and $34.00 per day effective June 1, 2005 * * *.

The Fund's rules prohibit waiting periods for contributions on new hires in excess of 30 calendar days; therefore, at the Fund's insistence, Blue Sky and Local 247 also executed a Letter of Understanding in 1998 (the "LOU") that indicated that contributions were due on new hires after 30 days on the payroll:

> The parties agree that pension contributions will be paid to Central States Pension Fund on behalf of all employees (regardless if they are labeled as part-time or casual), who perform work as described in the collective bargaining agreement after they have been on the Employer's payroll for thirty (30) calendar days. Said contributions will be paid for all compensable periods, including, but not limited to, actual days worked, paid vacations, paid holidays, paid sick days, etc. * * *.

The LOU was extended for the term of the 2001 CBA.

In 1997, Blue Sky and Local 247 executed a Participation Agreement which also required Blue Sky to pay contributions to the Fund. The Participation Agreement indicated that "the Employer agrees to be bound by, and hereby assent[s] to, all of the terms of the Trust Agreement creating said * * * Fund, as amended, all of the rules and regulations heretofore adopted by the

Trustees * * * and all of the actions of the Trustees in administering such Trust Fund." The duration clause of the Participation Agreement states:

> This Agreement shall continue in full force and effect until such time as the Employer notifies the Fund(s) by certified mail * * * that the Employer is no longer under a legal duty to make contributions to the Fund(s) * * * * The Employer expressly agrees and hereby acknowledges by the signing of this Agreement that its obligation to make contributions to the Fund(s) shall continue until the above-mentioned written notice is received by the Fund(s) and the Trustees acknowledge the Employer's termination in writing.

The duration clause of the incorporated Trust Agreement provides:

> [T]he obligation to make such contributions shall continue (and cannot be retroactively reduced or eliminated) after termination of the collective bargaining agreement until the date the Fund receives a) a signed contract that eliminates or reduces the duty to contribute to the Fund or b) written notification that the Employer has lawfully implemented a proposal to withdraw from the Fund or reduce its contributions at the above-specified address. The obligation to make such contributions shall continue during periods when the collective bargaining agreement is being negotiated, but such contributions shall not be required in case of strike after contract termination, unless the parties mutually agree otherwise.

During the period of November 1997 through November 2007, Blue Sky reported the work history of its employees to the Fund by submitting monthly reports and monthly contributions to the Fund. Blue Sky contends that it served a timely notice on Local 247 on May 31, 2006, which terminated the 2001 CBA. However, there is no evidence in the record indicating that Blue Sky served a written notice of termination on the Fund, as required by the duration clauses in the agreements, prior to the Trustees' termination of Blue Sky's participation in December 2007.[3] Additionally, Blue Sky continued to pay the drivers wages at the rates

---

[3] The Trust Agreement indicates that undisclosed union-employer agreements are not binding on the Fund:

> Any agreement or understanding between the parties that in any way alters or affects the Employer's contribution obligation as set forth in the collective bargaining agreement shall be submitted promptly to the Fund...; any such agreement or understanding between the parties that has not been disclosed to the Fund as required by this paragraph shall not

specified by the 2001 CBA, continued to deduct union dues from the drivers' wages and remit dues to Local 247, and continued to remit contributions to the Fund through November 2007. These payments were made in accordance with signed bills that contained a Certification Clause that provided: "By making payments or reporting work history, the employer hereby reaffirms its obligation to make contributions required by the Collective Bargaining Agreement, accepts and agrees to be bound by the Fun[d] trust agreement * * *." Furthermore, on March 19, 2008, Michael Bates, Blue Sky's president, sent a letter to Local 247 which stated:

> This Collective Bargaining Agreement carried an expiration date of May 31, 2006. Pursuant to Article XXIII, Section 1, it continued in full force and effect on a year to year basis and accordingly, has a current expiration date of May 31, 2008. In accordance with Article XXIII, Section 2, please be advised that Blue Sky Heavy Hauling, Inc. wishes to negotiate changes or revisions to this Collective Bargaining Agreement.

During the period of June 2006 through May 2008, Blue Sky and Local 247 engaged in collective bargaining agreement negotiations. No agreement was ever reached, and Local 247 was ultimately decertified as the bargaining representative for Blue Sky's employees in October 2008.

### B. The Plan

The Trustees adopted a defined benefit plan that provides monthly benefit payments for life upon retirement to covered employees who satisfy the Fund's vesting requirements. An employee's monthly benefit increases for each dollar of contributions paid on his/her behalf, and there are benefit enhancements when an employee crosses service thresholds of 20, 25, and 30 years.

The Fund has adopted an adverse selection rule which was described in Special Bulletin 90-7. This rule prohibits any "arrangement [that] restricts pension coverage to only those

---

be binding on the Trustees and shall not affect the terms of the collective bargaining agreement which alone shall be enforceable.

employees likely to receive a benefit and excludes those employees less likely to receive a benefit." The arrangements prohibited by the rule include the setting up of a separate corporation "which consists of employees who perform the same type of work as the covered bargaining unit."

During an audit initiated in 2006, the Fund confirmed that there was a second corporation owned by the owners of Blue Sky known as Jackie's Transport, Inc. ("Jackie's"), which worked from the same location as Blue Sky. Jackie's existed before the incorporation of Blue Sky and it also had a labor contract with Local 247, but Jackie's CBA did not require contributions to the Fund. Starting in 2003, new hires were placed on Jackie's payroll. At their November 13, 2007 meeting, the Trustees unanimously determined that this arrangement, where drivers were working side by side for related entities but only some participated in the Fund, violated the adverse selection rule and they terminated Blue Sky's participation in the Fund effective December 1, 2007. According to the Fund, the Trustees' action was based upon the Trust Agreement which provides:

> The Trustees are authorized to reject any collective bargaining agreement, participation agreement and/or terminate the participation of an Employer (and all contributions from the Employer) whenever they determine either that the agreement is unlawful and/or inconsistent with any rule or requirement for participation by Employers in the Fund and/or that the Employer is engaged in one or more practices or arrangements that threaten to cause economic harm to, and/or impairment of the actuarial soundness of, the Fund (including but not limited to any arrangement in which the Employer is obligated to make contributions to the Trust Fund on behalf of some but not all of the Employer's bargaining unit employees * * * * Any such rejection and/or termination by the Trustees of a collective bargaining agreement shall be effective as of the date determined by the Trustees (which effective date may be retroactive to the initial date of the term of the rejected agreement) and shall result in the termination of the Employer and all Employees of the Employer from further participation in the Fund on and after such effective date.

Prior to the termination, the Fund requested that Blue Sky provide documentation if Blue Sky believed that there were differences in the type of work being performed by each company. Blue Sky did not respond. In his October 2010 declaration, Bates stated that he was unaware of any invitation to present a defense at the Trustee's Board meeting on November 13, 2007, relating to Blue Sky's status. However, during his deposition four months earlier, Bates testified that the reason that Blue Sky did not provide any response to the Fund's request for information was because Blue Sky did not deny that there was a violation of the adverse selection rule.[4] Bates admitted that the two companies do "similar hauling work" and that he couldn't "differentiate" between the work that the two companies performed.

The termination of Blue Sky's participation triggered a $963,000 withdrawal liability assessment. Blue Sky made the "review request" required by 29 U.S.C. §§ 1399(b)(2), 1401(a)(1) to preserve its challenge to the assessment. The review request did not contest the decision to terminate participation; instead, Blue Sky maintained that the assessment should be recalculated because its duty to contribute ended with the alleged May 2006 termination of the 2001 CBA. The review request did not assert that the duty to contribute ended before 2006.

During the period of 1997 through November 30, 2007, Blue Sky's drivers earned pension credit. Included within this credit are the benefits that the Fund has paid the employees who have retired and the benefit entitlement of the employees who have not yet retired. If Blue

---

[4] Bates executed his affidavit, in which he set forth additional information regarding Blue Sky and Jackie's, after his June 2010 deposition. To the extent that the statements in Bates' affidavit contradict his deposition testimony, the Court will not consider the affidavit in ruling on the summary judgment motions. A plaintiff cannot defeat a motion for summary judgment by "contradict[ing] deposition testimony with later-filed contradictory affidavits." *Ineichen v. Ameritech*, 410 F. 3d 956, 963 (7th Cir. 2005). See also *Holland v. Jefferson Nat'l Life Ins. Co*., 883 F.2d 1307, 1312 (7th Cir. 1989). As the Seventh Circuit has explained, "we have long followed the rule that parties cannot thwart the purpose of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions * * * * If such contradictions were permitted * * * the very purpose of the summary judgment motion—to weed out unfounded claims, specious denials, and sham defenses—would be severely undercut.'" *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996).

Sky's participation ended before 2007, the monthly pensions payable to the employees will be reduced and those who have already retired will be liable to the Fund for benefit overpayments.[5]

### C.     The Audit

The Fund conducted an audit of Blue Sky's books and records for the period of January 2002 through November 2007. The audit revealed that Blue Sky failed to pay a portion of the required contributions with respect to individuals who performed covered work under the 2001 CBA during the audit period, resulting in a delinquency of $34,380.80. Of this amount, the Fund contends that $6,260.43 relates to employees who did not have contributions paid on their behalf after the 30th day of employment as required by the LOU. Blue Sky contends that the remaining $28,120.40 is not due because the daily contribution was not owed for any day on which a driver worked less than 8 hours. However, the 1997 CBA and the 2001 CBA do not contain any provision that expressly limits contributions to the Fund only when a driver works an 8-hour day. Rather, the Plan Document states as follows: "A Collective Bargaining Agreement shall be acceptable only if such Agreement requires a Contributing Employer to make Employer Contributions * * * on behalf of each Employee who receives compensation for any part of an applicable Contribution Period." Blue Sky admits that it did not have any oral "agreement" with Local 247 concerning what constituted a day for purposes of making contributions to Central States, but contends that Local 247 advised Bates that the union would agree to interpret a "day"

---

[5]   The Fund provided a copy of a summary detailing the impact on the employee's benefits and potential reductions of a termination on June 1, 2006, January 1, 2002, and November 1997. For example, if Blue Sky withdrew at the start of 2002, the monthly benefit of $2,179.84 currently being paid to retiree John Wiegand would be prospectively reduced to $386.70 and he would owe the Fund an overpayment of $55,587.34 for the period from his March 2008 retirement ($2,179.84 - 386.70 x 31 months = $55,578.34). The summary also details the amounts of the potential benefit reductions and overpayments for the other 6 retirees and the 8 active employees if Blue Sky withdrew in 2002 as well as the potential reductions and overpayments for the fifteen employees if Blue Sky withdrew in 1997 or 2006.

to mean eight hours of work. Blue Sky has not identified the individual with Local 247 who relayed this information to its president.

### D. Counterclaims

Blue Sky filed counterclaims seeking recovery of more than $500,000 in contributions that it paid to the Fund since 2002. Initially, Blue Sky did not challenge the Trustees' determination that Blue Sky violated the Fund's adverse selection rule. On the contrary, Blue Sky maintained that it was continuously in violation of the rule from 2002 or earlier, thereby triggering a "unilateral withdrawal" from the Fund by 2002. As a result, Blue Sky claimed that the contributions sought by the Fund in the audit from 2002 to 2007 were not due and that the contributions it paid to the Fund after the rule violation must be returned. Alternatively, Blue Sky maintained that it withdrew from the Fund when its collective bargaining agreement allegedly terminated on May 31, 2006, even though Blue Sky continued to comply with the terms of the collective bargaining agreement, continued to submit contribution reports and contributions to the Fund through November 2007, and did not comply with the termination requirements set forth in the Participation Agreement and the Trust Agreement. Then, in response to the Fund's summary judgment motion, Blue Sky's position changed, and it now maintains that the adverse selection rule and the provision of the Trust Agreement authorizing the Trustees to select the date of termination are void because they are unconscionable and violate public policy and that Blue Sky never violated the adverse selection rule in the first place.

## II. Standard of Review

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Factual

disputes that are irrelevant to the outcome of the suit "will not be counted." *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003) (quotation marks and citations omitted). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

III. **Analysis**

A. **Blue Sky's New Theory**

In its opening brief, the Fund argued that Blue Sky remained contractually obligated to contribute until November 30, 2007, even if Blue Sky's violation of the adverse selection rule

began at an earlier date, because the Trust Agreement authorizes the Trustees to select the termination date when the Fund's rule is violated. The Fund also argued that the Trustees' selection of the November 30, 2007 termination date cannot be rejected under the applicable arbitrary and capricious standard of review (or even *de novo* review) because Blue Sky never suggested a different date and the date selected by the Trustees protects the pension expectations of Blue Sky's employees.

Rather than respond to the Fund's arguments, Blue Sky's brief raises new claims and defenses that were not previously advanced. These new claims were asserted after the close of discovery in July 2010. Specifically, the arguments in Blue Sky's response—that the adverse selection rule and the provision of the trust agreement authorizing the Trustees to select the date of termination are void because they are unconscionable and violate public policy and that Blue Sky never violated the adverse selection rule—have never been pled. Instead, the operative allegations of the counterclaims conceded that a violation of the rule had occurred, and Blue Sky instead argued that the date of termination had to be the date that the violation began in 2002 (or earlier) and therefore none of the contributions sought by the Fund for the period of 2002 to 2007 were due.[6]

---

[6]   The operative allegations of the counterclaim assert as follows:

> 21.      Prior to the date that Blue Sky entered into the Collective Bargaining Agreement with the Teamsters and began participating in the Central States pension fund in 2001, Central States' trustees had formally adopted a policy by which participating employers (such as Blue Sky) may be deemed to have effectuated a unilateral withdrawal from the fund by acting in a prohibited manner, known as the "Adverse Selection" policy.
>
> 22.      When an Adverse Selection occurs, the employer is deemed to have withdrawn from the fund and "withdrawal liability" may occur.
>
> ****
>
> 26.      Central States and Blue Sky dispute the date of Blue Sky's withdrawal from the pension fund.
>
> ****

Blue Sky's Response concedes that it is advancing new claims and defenses that were never pled:

> [Blue Sky's counterclaim was] pled as then known, however, since the filing of its counterclaims in *Blue Sky I* and *Blue Sky II*, Blue Sky has uncovered evidence demonstrating that Central States' adverse selection policy was applied in bad-faith vis-a-vis Blue Sky and that it is precisely the type of concept that the U.S. Supreme Court warned against as a "method or assumption unique to the calculation of withdrawal liability so manipulable as to create a significant opportunity for bias to operate."

Def. Resp. at 4. Prior to filing its response brief, Blue Sky did not challenge the validity of the rule, arguing only that it had been "misapplied" because Blue Sky unilaterally withdrew prior to its violation of the rule.[7] Furthermore, while Blue Sky's affirmative defenses included estoppel, this defense mirrored the assertions in the counterclaims that the Fund should be "prohibited from seeking delinquent contributions after [Blue Sky's] violation of the adverse selection policy"; the rule and its violation were not contested.

The Seventh Circuit has stated that a plaintiff "may not use [its] brief opposing summary judgment to introduce claims not stated in [its] complaint—at least not without a defendant's consent." *Berry v. Chicago Transit Authority*, 618 F.3d 688, 693 (7th Cir. 2010). Similarly, Blue Sky cannot use its brief opposing the Fund's summary judgment to introduce claims not set

---

28. According to Central States' correspondence to Blue Sky, Blue Sky had acted in a prohibited manner and engaged in "Adverse Selection" sometime during "the period 2002 through 2004."

\*\*\*\*

30. Blue Sky withdrew from the Central States pension fund at the start of 2002.

31. Alternatively, Blue Sky withdrew from the Central States pension fund prior to 2002.

32. Payments made by Blue Sky as contributions to Central States after the Adverse Selection were not owed as contributions and were mistakenly made based upon mistakes of law, fact, or both.

[7] In fact, arguing that *Central States II* should be reassigned and consolidated with this case, Blue Sky reiterated its position that overpayments were made because Blue Sky unilaterally withdrew from the Fund many years before Blue Sky ceased remitting contributions to the Fund in November 2007. See *Central States, Southeast and Southwest Areas Pension Fund v. Blue Sky Heavy Hauling, Inc.*, 2010 WL 4411956, at \*1 (N.D. Ill. Oct. 28, 2010).

forth in its counterclaims, as the Fund certainly has not consented to this tactic nor did Blue Sky seek to amend its counterclaims. Further, Blue Sky's new theory—that the adverse selection rule is unenforceable because it is unconscionable and violates public policy—advances affirmative defenses that were not pled. See *Honey Dew Associates, Inc. v. M & K Ford Corp.*, 241 F.3d 23, 27 (1st Cir. 2001); see also *Costello v. Grundon*, 625 F.3d 342, 360 (7th Cir. 2010); *Employers Ins. Of Wausau v. Titan Intern., Inc.*, 400 F.3d 486, 490 (7th Cir. 2005) (noting that "illegality is an affirmative defense to the enforcement of a contract"). Affirmative defenses that are not pled can be waived, particularly where the plaintiff does not have notice of the defense and was deprived of the opportunity to respond. See *Venters v. City of Delphi*, 123 F.3d 956, 968 (7th Cir. 1997). Blue Sky's attempt to spring new claims on the Fund after discovery has closed and the Fund has moved for summary judgment on the basis of the claims and affirmative defenses that were pled—and in reaction to clear authority supporting the Fund's position—is simply "bushwack[ing]" and not acceptable. *Id.* at 969.[8]

In addition to coming too late, Blue Sky's last-ditch effort to plead new theories also lacks merit. Pension funds provide a type of insurance for employees who pay into the system, and an adverse selection rule seeks to prevent employers from excluding workers who are less likely (probably because they are younger) to draw on the insurance. Because of Blue Sky's violation of the rule, Central States decided to expel Blue Sky from further participation. Blue Sky's lengthy response brief complains of the unequal balance of power between a small

---

[8] Blue Sky's Response also asks for different relief than it sought in its counterclaim. Despite the thrice-made allegation of the counterclaim that the Fund must be "requir[ed] * * * to refund to Blue Sky or credit to Blue Sky all sums mistakenly paid by Blue Sky but not owed" (see ¶¶ 36, 41, 46 of Counterclaim), Blue Sky now claims that it only wants an offset up to the $34,380 in additional contributions sought by the Fund. See Resp. at 6-7. Not surprisingly, Blue Sky does not cite any authority in support its position. Even if Blue Sky's challenges to the adverse selection rule had been preserved, this remedy would not be appropriate. If the adverse selection rule is unconscionable or violates public policy, the agreements are either void or the adverse selection rule will be severed and the remaining provisions of the agreements will remain in effect.

employer and a large pension plan which is flush with cash to litigate and endowed by Congress with a heavy advantage in court. Blue Sky contends that the Fund's adverse selection rule is really a "manipulable concept" which permits Central States to impose withdrawal liability at its whim. And, according to Blue Sky, because the participation agreement gives Central States the discretion to determine the effective date of withdrawal, Central States could have imposed any amount of liability from zero (if it chose a withdrawal date before any employees had earned vested benefits) to close to $1 million (which is the amount actually assessed)—for example, Blue Sky was allegedly violating the adverse selection rule from the moment it signed the agreements with the union, but Central States did not complain about the problem for nearly ten years. See, *e.g.*, *Central States Pension Fund v. Blue Sky Heavy Hauling, Inc.*, 2011 WL 1113396, at *3 (N.D. Ill. Mar. 23, 2011) (summary judgment opinion in "*Central States II*").

Blue Sky maintains that the provision authorizing the Trustees to select the date of termination is unconscionable and contrary to public policy. To be invalidated as unconscionable, a contract must be both procedurally unconscionable in the sense that there was "gross inequality in bargaining" and substantively unconscionable in the sense that the terms are "unreasonably favorable to the stronger party." *Devalk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326 332-33 (7th Cir. 1987). In light of the need to show "gross inequality in bargaining," the defense of unconscionability "has rarely succeeded outside the areas of consumer contracts." *Northrup Corp. v. Litronic Industries*, 29 F.3d 1173, 1180 (7th Cir. 1994). No effort has been made by Blue Sky to show any procedural unconscionability.

To establish substantive unconscionability, Blue Sky must demonstrate that the term is one that "no one in his right mind would have agreed to." *Original Great Am. Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273 (7th Cir. 1992). The provision allowing the Trustees to

select the termination date comes into play only vis-a-vis an employer that breaches its promise to comply with the rule. It is not unreasonable for a non-breaching party to have discretion over the date of termination in order to minimize the harm caused by the loss occasioned by the breach. Blue Sky's theory is that because it was cheating since 1997, the 2007 termination is inequitable and the agreements must be voided retroactive to 1997, even though this would necessarily require cancellation of the pension credit earned by the employees over a ten-year period, resulting in catastrophic benefit reductions. See, *e.g.*, *Borntrager v. Central States Se. & Sw. Areas Pension Fund*, 625 F. Supp. 2d 685 (N.D. Ia. 2008) (concluding that the trustees "had not only the authority, but the fiduciary obligation, to take appropriate action to ensure the financial integrity of the fund * * * * That includes establishing the effective date of participants' termination"), aff'd, 577 F.3d 913 (8th Cir. 2009).

Although Blue Sky claims that its violation of the adverse selection rule was "open and notorious," Blue Sky has not introduced any admissible evidence of actual knowledge by the Fund prior to 2006. Blue Sky also claims that Local 247 knew, but the union is not the Fund's agent. See *Teamster's Local 348 Health and Welfare Fund v. Kohn Beverage Company,* 749 F.2d 315, 319 (6th Cir. 1984) ("While it may be reasonable for an employee and union member to believe that a union representative has authority to act on behalf of the fund, * * * reliance by an employer, with knowledge of the plan, on the statements of a union representative is unreasonable") (citing *Martin v. Hamil,* 608 F.2d 725, 730 n.8 (7th Cir. 1979) (employer who was aware of provisions in CBA could not reasonably rely on contrary advice from the union business agent); see also *Hanley v. Adam*, 1998 WL 560282, at *9 (N.D. Ill. Aug. 26, 1998) (representatives of local unions are not agents of the Fund). Having failed to support its

argument with admissible evidence that the Fund knew of Blue Sky's violation for several years, Blue Sky's speculation cannot defeat summary judgment.

The gist of Blue Sky's argument is that adverse selection is a "highly suspect concept" and "as applied to it here is unconstitutional under the Due Process and Takings Clauses." See Resp. at 31–32. However, Blue Sky fails to present legal authority in support of its undeveloped arguments. Nor does Blue Sky explain its assertion that the Court can apply "equitable estoppel" or that Blue Sky's liability is "the result of a breach of implied duty of good faith and fair dealing." See also *Central States II*, 2011 WL 1113396, at *3. Perhaps this is because the *en banc* decision in *Central States Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1154-55 (7th Cir. 1989), cited by the Fund in its opening brief but ignored by Blue Sky in its response, appears to endorse the Fund's adverse selection rule and also concludes that "no matter why plans have a rule of all-in-or-out, they have it, and an employer must play by the rules." In any event, without legal argument or authority to support its position, and in the face of unambiguous documents which demonstrate Blue Sky's consent to be bound by the relevant agreements, Blue Sky has failed to identify any legal theory for relief.

The only theories that Blue Sky pled were in regard to "unilateral withdrawal" and the contention that the duty to contribute ended with the termination of the 2001 CBA. As demonstrated above, Blue Sky's remaining arguments fail because they were not pled and because Blue Sky has failed to cite legal authority in support of its position. The Court proceeds to address the only theories properly advanced by Blue Sky's answer and counterclaims.

### B.     Withdrawal and Contribution

In its opening brief, the Fund argued that Blue Sky's contentions fail because (1) the trust agreement unambiguously authorizes the Trustees to select the date of withdrawal from the Fund

and (2) the decision in *Central States Pension Fund v. Schilli Corp.*, 420 F.3d 663, 672 (7th Cir. 2005), established that the duty to contribute continued even if the 2001 CBA terminated under the Participation Agreement. Blue Sky did not respond to these arguments.

As set forth above, up until Blue Sky filed its response brief, the parties did not dispute that Blue Sky violated of the adverse selection rule and that the subsequent termination of Blue Sky's participation in the Fund was appropriate. Blue Sky's president testified at his deposition that that the two companies (Blue Sky and Jackie's) do "similar hauling work" and that he couldn't "differentiate" between the work that the two companies performed. During his deposition, Bates testified that the reason that Blue Sky did not provide any response to the Fund's request for information was because Blue Sky did not deny that there was a violation of the adverse selection rule. The sole dispute between the parties was whether the Trustees had discretion to select the termination date or whether the termination had to be retroactive to the date the violation of the adverse selection rule began.

Nothing in the relevant documents supports Blue Sky's "unilateral withdrawal" theory. To the contrary, Blue Sky agreed under the Trust Agreement that "[a]ny rejection and/or termination by the Trustees of a collective bargaining agreement shall be effective *as of the date determined by the Trustees* (which effective date *may* be retroactive to the initial date of the term of the rejected agreement) * * *." (emphasis added). In *Borntrager v. Central States Se. & Sw. Areas Pension Fund*, the employer argued that the Trust Agreement provision authorizing the Trustees to select a termination date in the middle of the term of its 1999-2004 labor contract violated ERISA and federal labor law. 625 F. Supp. 2d 685 (N.D. Ia. 2008). The court rejected the employer's argument:

> Article III, Sec.1 [of the Trust Agreement] further provides that the rejection of a
> collective bargaining agreement "shall be effective as of the date determined by

the Trustees" * * * * Nothing in [ERISA or federal labor law] * * * prohibits a multiemployer plan from rejecting a collective bargaining agreement, *or restricts when such an expulsion may occur* * * * * Under the common law of trusts, as under the Central States trust agreements, trustees are understood to have all "such powers as are necessary or appropriate for the carrying out of the purposes of the trust." Thus, the Trustees in this case had not only the authority, but the fiduciary obligation, to take appropriate action to ensure the financial integrity of the fund. *That includes establishing the effective date of participants' termination.*

625 F. Supp. 2d at 695 (citation omitted) (emphasis added). Similarly, in the present case, the

Trust Agreement gave the Trustees the authority to take appropriate action to protect the integrity

of the Fun.

The Trust Agreement also indicates that "all questions or controversies" must be

submitted to the Trustees and "the Trustees are vested with discretionary and final authority in

making all such decisions * * * [which] shall be binding upon all persons dealing with the

Fund." The Seventh Circuit has held that under this language, "all controversies over anything *

* * related to the Trust or Plan must be submitted to the Trustees and * * * their decision on the

matter shall be binding" unless it is arbitrary or capricious. *Exbom v. Central States, Se. & Sw.

Areas Health Fund*, 900 F.2d 1138, 1141 (7th Cir. 1990); *Urbania v. Central States, Se. & Sw.

Areas Pension Fund*, 421 F.3d 580, 585 (7th Cir. 2005). This requirement that all questions and

controversies be submitted to the Trustees applies to issues relating to a decision to terminate the

participation of an employer, including the selection of the termination date. See *Borntrager*,

625 F. Supp. 2d at 698, aff'd, 577 F.3d 913, 920 n. 2 (8th Cir. 2009); *Central Hardware Co. v.

Central States, Se. & Sw. Areas Pension Fund*, 770 F.2d 106, 109 (8th Cir. 1985); *Fort Transfer

Co. v. Central States Se.& Sw. Areas Pension Fund*, 2007 WL 707545 *5 (N. D. Ill 2007).

Under the arbitrary and capricious standard, the selection of the November 30, 2007 termination

date cannot be rejected unless the Trustees "not only made the wrong call, but a downright

unreasonable one." *James v. GM Corp.*, 230 F.3d 315, 317 (7th Cir. 2000).

Under the arbitrary and capricious standard of review, the court's review is limited to the evidence in the administrative record. Arguments that were not presented to the Trustees are waived. *Perlman v. Swiss Bank Co. Disability Plan*, 195 F.3d 975, 981-82 (7th Cir. 1999); *Fort Transfer*, 2007 WL 707545, at *6; *Layes v. Mead Corp.*, 132 F.3d 1246, 1251 (8th Cir. 1998); *Sandoval v. Aetna Life Ins. Co.*, 967 F.2d 377, 380-81 (10th Cir. 1992). Blue Sky failed to make its "unilateral withdrawal" argument to the Trustees. But even if there had been no waiver, the selection of the November 30, 2007 date was not "downright unreasonable," since no other date was ever suggested by Blue Sky. Even Blue Sky's subsequent withdrawal liability review request did not assert that a "unilateral withdrawal" occurred in 2002 or earlier; rather, it only asserted that the duty to contribute ended with the alleged termination of the 2001 CBA on May 31, 2006. The "unilateral withdrawal" theory was not advanced until the counterclaims were filed in 2010.[9]

Pursuant to the Participation Agreement, Blue Sky remained obligated to contribute to the Fund until Blue Sky provided a written notice by certified mail that Blue Sky "is no longer under a legal duty to make contributions," which stated "the specific basis upon which Blue Sky is relying in terminating its obligation to make contributions." *In Central States, Se. & Sw. Areas Pension Fund v. Schilli Corporation*, the court held that this provision "explicitly provides that [an Employer's] * * * contribution duties will continue until it gives the prescribed notice *even if the applicable collective bargaining had terminated.*" 420 F.3d 663, 672 (7th Cir. 2005)

---

[9] Blue Sky has made little to no effort to demonstrate that the Trustees' determination was "downright unreasonable." Furthermore, under ERISA, a trustee must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. §1104(a)(1). While it is certainly true that the Trust Agreement gave the Trustees the authority to select an earlier date, it would have had an adverse effect on the participants and beneficiaries that the Trustees are obligated to protect. Blue Sky's argument wholly ignores this reality and it has not put forth any evidence to counter the Fund's detailed evidence demonstrating the adverse effect that an earlier date would have on the participants and beneficiaries.

(emphasis added). It is undisputed that the "prescribed [written] notice" was never given by Blue Sky, so it remained obligated to contribute until December 1, 2007 under the Participation Agreement. *Id.* In addition, the Trust Agreement indicates that "the obligation to contribute shall continue * * * after termination of the collective bargaining agreement until the date the Fund receives (a) a signed contract that eliminates or reduces the duty to contribute to the Fund or (b) written notification that the Employer has lawfully implemented a proposal to withdraw from the Fund * * *." Like the Participation Agreement, the Trust Agreement "obligates [an employer] to continue making contributions until the notice provisions are satisfied." *Central States, Se. & Sw. Areas Pension Fund v. Auffenberg Ford*, 2009 WL 2145384, at *5-6 (N.D. Ill. 2009). Blue Sky remained obligated to contribute to the Fund pursuant to the Trust Agreement through November 30, 2007, because the required notice of termination of the Trust Agreement was not served.[10]

## B. Damages

The unambiguous terms of the 2001 CBA and the Fund documents require Blue Sky to submit contributions to the Fund for each day a driver performed any work. The pension clause of the 2001 CBA provides that Blue Sky "agrees to pay into the [Fund] * * * for each employee * * * a contribution * * * per day for each regular employee covered by this Agreement." The Letter of Understanding signed by Blue Sky provides that "contributions will be paid for all compensable periods, including, but not limited to, actual days worked * * *." Further, the Plan

---

[10] Additionally, the Certification Clause on the bills signed by Blue Sky stated that Blue Sky "reaffirms its obligation to make contributions required by the Collective Bargaining Agreement, [and] accepts and agrees to be bound by the Fund(s) trust agreement * * *." Thus, each month Blue Sky remitted the signed bills that contained the Certification Clause, Blue Sky reaffirmed its intention to be bound by the Trust Agreement and the pension clause of the 2001 CBA (the Certification Clause did not require Blue Sky to reaffirm other provisions of the 2001 CBA). *Central States, Se. & Sw. Areas Pension Fund v. Kabbes*, 2004 WL 2644515, *14-17 (N.D. Ill. Nov. 18, 2004). Under the Certification Clause, Blue Sky remained obligated to contribute through November 2007. *Id.*

Document provides that a "Collective Bargaining Agreement, shall be acceptable only if such agreement requires a Contributing Employer to make Employer Contributions on behalf of each Employee who receives compensation for any part of the applicable contribution period."

Blue Sky maintains alleged that it had an oral agreement with an unidentified Local 247 representative that the daily contribution was not due for any day an employee worked less than eight hours. Beyond the fact that Blue Sky has not identified the Local 247 employee that allegedly made this agreement, ERISA "prevent[s] a court from giving force to oral understandings between a union and employer that contradict the writings." *Gerber Truck Service*, 870 F.2d at 1154. Blue Sky concedes that there is no "express provision" in the 2001 CBA that supports its eight-hour argument and it does not challenge the Fund's showing that the argument is foreclosed by the Letter of Understanding, which provides that "contributions will be paid for all compensable periods," and the Plan Document, which indicates that a "Collective Bargaining Agreement shall be acceptable only if such agreement requires a Contributing Employer to make Employer Contributions on behalf of each Employee who receives compensation for *any part of the applicable contribution period*." (emphasis added). Since the writings are not ambiguous, Blue Sky's evidence is not admissible, and pursuant to the agreements and facts disclosed in this case, contributions must be paid on any employee who worked more than 30 days for any day an employee worked any hours.

Blue Sky also asserts that the Fund's calculation of the delinquency is wrong. In ¶ 49 of Blue Sky's response to the Fund's Local Rule 56.1 Statement, which alleged a $34,380 delinquency based upon the affidavit of Carol Evans, the Fund's Division Manager of its Field Audit Division, Blue Sky simply asserts "Denied as untrue (Declaration)." The "Declaration" presumably refers to Michael Bates' Declaration, which asserts that "Blue Sky denies owing

$34,380.80 as the audit principal and disputes Central States' alleged audit findings * * * * Blue Sky found errors in Central States' audit amount."  These conclusory assertions of unidentified errors necessitating a trial over a $34,380.80 claim are patently insufficient to satisfy Blue Sky's obligation to produce evidence to support its challenges to the Fund's counterclaims at this "put up or shut up" moment in the litigation.  *Johnson v. Cambridge Indust. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (summary judgment is "a 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events").  Blue Sky's claim that its analysis of the audit is "work product" similarly fails. Information that is merely factual may not be withheld as work product.  *Allen v. Chicago Transit Authority*, 198 F.R.D. 495, 500 (N.D. Ill. 2001); *Lenihan v. Stewart Enterprises, Inc.,* 2002 WL 31001842, at *6 (E.D. La. Sept. 4, 2002) ("damage calculations * * * are not work product.").

Under ERISA, an employer has a fiduciary duty to accurately report employee work history and it is entitled to credit for an overpayment only if the payment was both made by mistake of law or fact and the equities favor the refund.  29 U.S.C. § 1103(C)(2)(A)(ii); *UIU Severence Pay Fund v. Local Union 18-U*, 998 F.2d 509, 513 (7th Cir. 1993); *Trustees of Will County Carpenters Welfare Fund v. F.V.E. & Assoc., Inc.*, 2001 WL 1571453 (N.D. Ill. Dec. 4, 2001).  ERISA "did not impose the risk of mistaken contributions on the funds, particularly since the employer is in the best position to monitor the amount of its own contributions." *Crown Cork & Seal Co. v. Teamsters Pension Fund of Philadelphia*, 549 F. Supp. 307, 312 (E.D. Pa. 1982). To prevent the audit process from being bogged down by the issues of whether a mistake actually occurred and which equity favors the refund, the Fund's audits do not seek to identify overpayments, unless a glaring error is detected.  Under the trust agreement and ERISA, the onus

is on the employer to make "a request for credit" and identify the overpayment. Moreover, as the party asserting that there were overpayments, Blue Sky has the burden of proof, but Blue Sky admittedly has not identified any specific overpayments, much less described why it believes a mistake has occurred or that equity favors a credit.[11] At this stage of the case, Blue Sky's failure to itemize the allege overpayments and audit errors in response to the Funds' evidence in support of the delinquency is fatal. See, *e.g.*, *Dickenson v. Cardiac & Thorasic Surgery of E. Tenn.*, 388 F.3d 976, 983 (6th Cir. 2004) ("A party that without substantial justification fails to disclose information required by Rule 26(a) [which includes "a computation of each category of damages claimed by the disclosing party] * * * is not, unless such failure is harmless, permitted to use as evidence at a trial * * * any witness or information not so disclosed"); Fed. R. Civ. P. 26(a)(1)(A)(iii).

Based on the foregoing, the Fund is entitled to recover $34,380.80 in delinquent contributions. The Fund also claims that it is entitled to recover interest, liquidated damages, attorney' fees, and costs from Blue Sky. 29 U.S.C. §§ 1132(g)(2), 1451(b). Blue Sky has not raised any objection to this request, and the Court will grant this relief. Pursuant to 29 U.S.C. § 1132(g)(2) and the Trust Agreement, the Fund is entitled to: (a) the unpaid contributions; (b) the greater of doubled interest or single interest plus liquidated damages not in excess of twenty percent (20%) on the unpaid contributions; and (c) reasonable attorneys' fees and costs and audit fees and costs. *Operating Engineers Local 139 Health Benefit Fund v. Gustafson*, 258 F.3d 645, 652 (7th Cir. 2001). The total amount owed as of September 17, 2010 was $82,575.80 consisting of: $34,480.80 in contributions, $16,411.50 in interest, $16,411.50 in doubled interest, and $15,272.00 in audit fees and costs. In addition, under the Trust Agreement, post judgment

---

[11] Blue Sky asserts that it provided the Fund with ample documentation disputing Central States' calculations in documents that it had bates-stamped 01 through 0821. However, these 821 pages are simply the payroll records that the Fund audited. Blue Sky did not identify any overpayments.

interest is due at the greater of 7.5% or the prime rate plus 2%.  *See Central States Se. & Sw. Areas Pension Fund v. Bomar National, Inc.,* 253 F.3d 1011, 1020 (7th Cir. 2001).

## IV.    Conclusion

For these reasons, the Court grants the Fund's motion for summary judgment [102] and dismisses Defendant Blue Sky's counterclaims.[12]  The Court orders Blue Sky to pay $82,575.80 with post-judgment interest to accrue at the greater of 7.5% or the prime rate plus 2%.  Judgment is entered in the Fund's favor on its claims and on Blue Sky's counterclaims.  The Fund's attorneys fee request may be presented in accordance with Local Rule 54.3.

Dated:  May 31, 2011

_____
        Robert M. Dow, Jr.
        United States District Judge

---

[12]   In respect to the counterclaims, Blue Sky appears to have abandoned them in favor of the new theory advanced in the response brief.  However, to the extent that Blue Sky has not abandoned them, the Fund is entitled to summary judgment on Blue Sky's counterclaims for the reasons set forth above— specifically, because the Court has determined that (i) Blue Sky's "unilateral withdrawal" theory is without merit under the Trust Agreement, (ii) Blue Sky's alternate theory that its obligation to contribute ended when the 2001 CBA allegedly terminated in May 2006 is without merit because the duty to contribute continued under the Participation and Trust Agreements, and (iii) the alleged oral agreement that purported to limit Blue Sky's duty to contribute is invalid under the plan documents and ERISA.